**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                        )
STEPHEN ELLICOTT,                       )
                                        )
        **Plaintiff,**                  )
                                        )
    v.                                  )
                                        )
AMERICAN CAPITAL ENERGY, INC.,          )   **Civil Action No.**
THOMAS HUNTON, and                      )   **14-12152-FDS**
ARTHUR HENNESSEY,                       )
                                        )
        **Defendants.**                 )
_____)

## ORDER ON MOTIONS IN LIMINE

This is a contract dispute between a solar energy company and a former sales employee over allegedly unpaid commissions for solar-installation projects.  Plaintiff Stephen Ellicott has brought suit against American Capital Energy, Inc. ("ACE") and its two principals, Thomas Hunton and Arthur Hennessey.  The complaint alleges claims for violations of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148 and breach of contract.

The parties have filed a number of motions in limine in advance of the trial in this action. In particular, the parties have moved as follows:

- plaintiff's motion to exclude evidence or argument that plaintiff was purportedly required to split commissions (Docket No. 122);

- plaintiff's motion to strike affidavit of Thomas Hunton (Docket No. 129);

- plaintiff's motion to exclude evidence or argument regarding plaintiff's withdrawn expense reimbursement claim (Docket No. 123);

- plaintiff's motion to exclude evidence or argument that plaintiff is responsible for paying back "negative commissions" (Docket No. 124);

- plaintiff's motion to exclude evidence or argument that business expenses previously paid to plaintiff are invalid (Docket No. 125);

- plaintiff's motion to exclude evidence or argument concerning defendant's purported commission calculation (Docket No. 134); and

- defendants' motion on finances and pending litigation (Docket No. 130).

Each motion will be addressed in turn.

## I.   <u>Background</u>

### A.   <u>The Parties</u>

Plaintiff Stephen Ellicott resides in Barrington, Rhode Island.  Defendant American Capital Energy, Inc. is a solar energy company with a principal place of business in Massachusetts.  Defendants Thomas Hunton and Arthur Hennessey are principals of ACE. Hunton is ACE's president.  Hennessey is ACE's chief financial officer.

From 2007 to 2013, Ellicott worked for ACE as a sales employee, with a focus on marketing large-scale solar installations to commercial clients.  Ellicott was not a partner or joint-venturer with Hunton and Hennessey; rather, he was an ACE employee compensated on a commission-draw basis.

### B.   <u>The Compensation Letter</u>

On April 23, 2008, Hunton signed a letter that he described as a "[c]omp plan confirmation for Steve Ellicott with American Capital Energy."  (Docket No. 122, Tab A).  In that compensation plan, ACE agreed to pay a sales commission to Ellicott of "40% of profit margin on each sale and installation to be paid within 30 days after the client pays ACE and installation is complete."  (*Id.*).  The plan provided that those commissions "may be reasonably split with various sales support personnel by mutual agreement."  (*Id.*).  The letter also provided

that "[t]here is a draw paid monthly at the annual rate of $120,000." Finally, the letter provided

that "[t]ravel expenses relating to the role will be reimbursed," "cell phone and service will be

provided or reimbursed by ACE," and "[o]ffice expenses are covered including . . .

[c]ommunication expenses . . . [o]ffice [e]quipment or notebook needed to perform your role . . .

[and c]opying and consumables." (*Id.*).

From 2008 to 2013, Ellicott sold eight solar-installation projects for which he may have

been entitled to commissions. For each of those eight projects, ACE completed the installation

and received payment in full from the client. Ellicott's eight projects generated $37,388,554 in

gross revenue for ACE. However, two of the projects did not generate a profit.

### C.   Ellicott's Commissions and Draws

The parties dispute virtually every other fact that is material to calculating Ellicott's

commissions. The disputed issues can be separated into two groups, both of which affect the

ultimate issue of whether ACE has failed to pay Ellicott his earned commissions in violation of

the Wage Act and his compensation plan. First, the parties dispute the amount of commissions

that ACE has already paid Ellicott. Second, the parties dispute, in at least four ways, how

Ellicott's commissions should be calculated. The Court will attempt to summarize the disputes.

To begin, the parties appear to agree that ACE paid Ellicott $613,468 in draws against his

commissions. It is also undisputed that ACE made eight additional payments totalling $76,888

to Ellicott from 2011 through 2013. However, the parties dispute whether those eight payments

were part of Ellicott's commissions. Although defendants characterize these payments as

"advances," it appears from documentation submitted by both Ellicott and ACE that these

payments were made as reimbursements for business expenses incurred in 2008 and 2009.

(Docket No. 125, Tab B), (Docket No. 126-1). Defendants contend that Ellicott "never properly

substantiated" or "reconciled or rectified" his requests for these reimbursements.  (Docket No. 126-1 ¶).  Therefore, when Ellicott was terminated in 2013, ACE "reversed" the reimbursements and credited the payments against the commissions owed to Ellicott.  (*Id*.).  Adding these credits to the paid draw, defendants contend that ACE paid Ellicott a total of $690,356 in commissions.  Ellicott contends that the eight payments of $76,888 were business-expense reimbursements, not commission advances, to which he was separately entitled under the terms of his compensation plan.  In support of that contention, Ellicott notes that ACE paid him those reimbursements only after he submitted expense reports.  Moreover, he contends that ACE deducted the payments as business expenses on its own tax returns, but did not list them as income paid to Ellicott on a Form W-2 or 1099.  Accordingly, Ellicott contends that ACE has paid him only $613,468 in commissions.

The parties further disagree on at least four variables that affect how Ellicott's commissions are calculated.  First, Ellicott contends that he earned 40 percent commissions on the profits of seven of the eight projects in question.  Defendants contend that the final five projects that Ellicott sold occurred after the parties orally modified his employment agreement to decrease his commissions to 30 percent.  In response, Ellicott notes that Hunton testified during his deposition that the oral modification did not occur until 2011, which was after seven of the eight projects began incurring costs.  Second, Ellicott contends that the terms of his employment agreement did not mandate that he pay "negative commissions" for unprofitable projects; he would simply earn no commission on those projects.  Defendants contend that Ellicott agreed to pay back any draws against his commissions that he ultimately did not earn.  Defendants' argument, however, goes even further.  It also argues that even if Ellicott did not accept any draws against his commissions, he would be required to compensate ACE for projects that

resulted in negative gross profits—that is, defendants are essentially arguing that Ellicott agreed to pay "negative commissions" on unprofitable projects.  Third, Ellicott contends that he did not agree to split his commissions with any sales support staff; defendants contend that he did.  Fourth, Ellicott contends that ACE arbitrarily reduced the gross profits for his projects by 6.6 percent of their direct costs in order to cover "overhead and maintenance" expenses.[1]  Defendants contend that it is generally accepted within the industry to deduct overhead and direct labor expenses from sales commissions.

Based on their respective positions on those four disputed issues, as well as how much they believe ACE has paid Ellicott in commissions already, Ellicott contends that he is entitled to $1.3 million in unpaid commissions; defendants contend that Ellicott actually owes ACE $286,391.

## II.   Analysis

### A.   Plaintiff's Motion to Exclude Evidence or Argument That Plaintiff Was Purportedly Required to Split Commissions (Docket No. 122)

Ellicott contends that any evidence or argument that he was required to split commissions with sales support personnel (or anyone else) should be excluded.  In substance, he argues that the contract permits, but does not require, commissions to be split; that such a split may occur only "by mutual agreement"; and that he never agreed to do so.  He further argues that the Court resolved that issue on summary judgment and that the ruling is therefore binding as the law of the case.

As noted, the contract states as follows:

Sales Commission – 40% of profit margin on each sale and installation to be paid within 30 days after client pays ACE and installation is complete.  *The*

---

[1] It appears that the calculation includes 1 percent for "O&M" expenses and 5.6 percent for "overhead" expenses.

*commissions may be reasonably split with various sales support personnel by mutual agreement.*

(emphasis added).

Defendants contend that the intent of the parties was that commissions would be split with sales support staff and others, such as engineers, who were necessary to the consummation of a sale.  In substance, defendants contend that there were two levels of decision-making as to the splitting of commissions:  (1) defendants could decide (unilaterally) that commissions should be split, and (2) the parties would then decide (by mutual agreement) how much should be paid and to whom.

It may well be true that defendants intended such an arrangement, and likewise true that such an arrangement would be fair and sensible.  But that is not what the contract says.  Instead, it simply states that "[t]he commissions may be reasonably split with various sales support personnel by mutual agreement."  As written, it is unambiguous, and requires the mutual agreement of the parties to split the commissions.  Defendants may not therefore introduce extrinsic evidence to vary the unambiguous terms of the contract.

Defendants further contend that there is an ambiguity as to the word "sale."  Defendants contend that as to two of the projects, Ellicott did not make the sale at all; instead, the sales occurred before he was hired, and that he was brought into the projects to learn the business, and that he should receive no commissions as to those two projects.

It would be unreasonable to interpret the contract literally:  that is, as providing a 40% commission to Ellicott on any sale the company made, to anyone, at any time, whether or not Ellicott had anything to do with it.  Certainly, a reasonable interpretation is that Ellicott would be paid a commission on sales that he made or for which he was entirely responsible.  It is unclear whether the commission should be payable on a sale where he was primarily, but not

exclusively, responsible, or whether it is payable if he consummated a sale that was started by someone else.  Whether a particular contract provision is ambiguous is a question of law for the court to decide.  *Bank v. Thermo Elemental Inc.*, 451 Mass. 638, 648 (2008).  However, once the court finds an ambiguity, it is up to the jury to determine what the parties intended as to the meaning of that term.  *Seaco Ins. Co. v. Barbosa,* 435 Mass. 772, 779 (2002).

Here, the term "sale" within the phrase "40% profit margin on each sale and installation" is ambiguous, at least as to situations where Ellicott worked on a sale, but not exclusively. Defendants may therefore introduce evidence tending to show that Ellicott did not actually make the sales in question, or was not primarily responsible for those sales.  Accordingly, the motion *in limine* will be granted as to evidence that plaintiff was required to split commissions, but denied as to evidence concerning the sales as to which a commission was payable.

### B.    Plaintiff's Motion to Strike Affidavit of Thomas Hunton (Docket No. 129)

Ellicott has moved to strike the August 11, 2016 affidavit of Thomas Hunton filed in support of defendants' response to plaintiff's motion *in limine* to exclude evidence that plaintiff was required to split commissions.  Ellicott contends that the affidavit materially contradicts Hunton's prior sworn deposition testimony.  *See Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994) (finding that a sham affidavit may be struck when it contradicts deposition testimony).  The Court, however, does not need to decide that issue.  The affidavit contains extrinsic evidence concerning whether Ellicott was required to split commissions under the contract provision.  Because that term is unambiguous, the affidavit constitutes parol evidence that is not relevant to the Court's interpretation.   Accordingly, the Court will deny the motion as moot.

7

C.      **Plaintiff's Motion to Exclude Evidence or Argument Regarding Plaintiff's
        Withdrawn Expense Reimbursement Claim (Docket No. 123)**

Ellicott has moved to exclude evidence of unreimbursed business expenses that relate to a claim he has since voluntarily dismissed from the complaint.

On April 2, 2014, Ellicott filed this action in Middlesex County Superior Court.  As originally pleaded, the complaint alleged that ACE had failed to reimburse Ellicott for business expenses totaling $91,508.  (Compl. ¶17).  On December 23, 2015, the Court granted Ellicott leave to file an amended complaint.  The amended complaint eliminated all mention of unreimbursed business expenses.

Defendants contend that they should be permitted to submit evidence about business expenses paid to Ellicott that were not properly substantiated.  Evidence that Ellicott brought and dropped certain claims is not, as a general matter, relevant to any of the claims at issue in trial.  Nor may that evidence be introduced to show that Ellicott had a character trait of dishonesty or a propensity to file false expense claims.  *See* Fed. R. Evid. 404(a).  It is conceivable that the evidence could be relevant under some circumstances, and admissible if a proper foundation has been laid, but defendants have not made such an argument at this stage.  Accordingly, to the extent that defendants seek to introduce evidence of Ellicott's dropped claims, absent such circumstances, the motion will be granted.

D.      **Plaintiff's Motion to Exclude Evidence or Argument That Plaintiff Is
        Responsible for Paying Back "Negative Commissions" (Docket No. 124)**

Ellicott has moved to exclude evidence that he owes ACE for amounts ACE lost on unprofitable projects.

In its April 28, 2016 Memorandum and Order on Cross-Motions for Summary Judgment, the Court resolved this issue in part.  That Order stated:

> ACE contends that Ellicott agreed to pay ACE 'negative commissions' for
> unprofitable projects even if he did not accept any draws.  That argument is wholly
> unsupported by the terms of Ellicott's compensation plan, as well as common sense.
> Ellicott was a sales employee compensated on a commission basis, not a partner or
> joint venturer with an equity stake in the company.

Defendants will not be permitted to revisit this issue by arguing that Ellicott owes ACE for

unprofitable projects.  Accordingly, the Court will grant the motion to the extent defendants seek

to proceed on a theory that Ellicott owes ACE for negative commissions for unprofitable

projects.

However, the Court's order did not resolve the scope of every project Ellicott sold.

Defendants contend that they intend to offer evidence that the Houwelings project should be

properly considered as a single project in two phases, rather than (as Ellicott contends) two

separate projects, one profitable and one unprofitable.  In defendants' view, Ellicott's

commission can only be determined when viewing the profits from the project as a whole,

offsetting profits from the first phase by losses in the second phase.  Whether the Houwelings

project is properly considered as one project in two phases or two separate projects is a question

for the jury.  Insofar as the motion seeks to exclude evidence of profit offsets for multi-phase

projects, it will be denied.

### E.     Plaintiff's Motion to Exclude Evidence or Argument That Business Expenses Previously Paid to Plaintiff Are Invalid (Docket No. 125)

Ellicott contends that any argument or evidence that his expense reimbursements should

be credited against his commissions is barred by the doctrine of equitable estoppel.  The basic

principle behind the equitable estoppel doctrine is that no person should benefit from his or her

own wrongdoing.  *Renovator's Supply, Inc. v. Sovereign Bank*, 72 Mass. App. Ct. 419, 426

(2008).  "To establish estoppel, a party must show '(1) a representation intended to induce

reliance on the part of a person to whom the representation is made; (2) an act or omission by

that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission.'" *Reading Co–Op. Bank v. Suffolk Construction Co., Inc.,* 464 Mass. 543, 556 (2013) (quoting *Bongaards v. Millen,* 440 Mass. 10, 15 (2003)).  Equitable estoppel is a disfavored doctrine that "is not applied except when to refuse it would be inequitable." *Thibbitts v. Crowley*, 405 Mass. 222, 229 (1989); *see also Licata v. GGNSC Malden Dexter LLC*, 466 Mass. 793, 804 (2014).

Ellicott has not demonstrated that defendants' re-categorization of his business expense reimbursements justifies the application of equitable estoppel.  He contends that defendants never advised him that it had problems with his expense reimbursements.  While it is true that silence may satisfy the first requirement of equitable estoppel, if it "constitutes a representation of consent," Ellicott must also show that the representation was intended to induce reliance, and that he actually detrimentally relied on the representation.  *Reading*, 464 Mass. at 556.  Of course, if defendants are successful in proving that the reimbursements were properly re-categorized as commissions, Ellicott will suffer a detriment.  However, to succeed on a claim for equitable estoppel, the detriment to Ellicott must be caused by his reliance.  It is not clear, to say the least, how any act or omission of defendants caused such a detriment.

In short, although ACE may, in fact, be wrong about whether the reimbursements are properly categorized as commissions, this is not an appropriate circumstance for the application of equitable estoppel.  The motion will therefore be denied.

### F.   Plaintiff's Motion to Exclude Evidence or Argument Concerning Defendant's Purported Commission Calculation (Docket No. 134)

Ellicott has moved to exclude evidence related to a commission calculation by defendants in their pretrial memorandum that is inconsistent with defendants' expert's report and the testimony of ACE's Rule 30(b)(6) witness.  Ellicott contends that defendants should not be

permitted to introduce a new calculation because defendants have consistently advanced a different theory for two years in this litigation. Ellicott further contends that he will require limited discovery on this issue should the Court permit the evidence to be used at trial.

This dispute centers around the commission owed to Ellicott on his last sale for the United Natural Foods, Inc. ("UNFI") project. On October 9, 2015, defendants' expert, Gregory Ginn, executed an affidavit stating that Ellicott's commission rate on all projects sold after 2010 was 30%, to be split equally between him and the staff. (Motion 134, Tab B). The affidavit stated that Ellicott was entitled to $163,892 for his contribution to the sale of the UNFI project in 2012, or half of the total $327,784 commission. (*Id*). Ellicott further contends that the deponent designated by ACE under Fed. R. Civ. P. 30(b)(6) similarly testified that Ellicott was entitled to a 30% commission on the UNFI sale, although he has not provided the court with corroborating evidence to that effect.

On August 22, 2016, defendants produced an accounting spreadsheet showing that Ellicott earned 40% commissions on all projects sold, both prior to and after 2010. It also shows that the UNFI project commission was subject to a policy dated February 9, 2012, and that under that policy, he was entitled to a $56,812 commission. Ellicott contends that defendants did not produce that policy prior to August 2016. Defendants respond that, in fact, they did produce the policy in disvocery, although they have not submitted a Bates-stamped version of the document to the Court in support of this contention. Defendants also state that that the February 2012 policy was discussed during the deposition testimony of Thomas Hunton, but again, have not provided the Court with the relevant transcript excerpts to substantiate that claim.

After multiple extensions, fact discovery closed in this matter on June 30, 2015, and all experts were to be deposed by November 30, 2015. Of course, defendants cannot produce a new

document at this late stage of the litigation that alters significant facts (if in fact that is what happened).  The Court need not resolve the issue, however, because it will base its decision on other grounds.

Defendants' latest accounting is clearly inconsistent with their expert's report.  The report states that Ellicott was entitled to a 40% commission on the first 3 projects, and a 30% commission on the last five projects, while the August 2016 spreadsheet uses a 40% commission rate for the first seven projects, and a commission based on the February 2012 policy for the UNFI project.  In fact, of the six projects on which ACE made a profit, only one of the calculations for Ellicott's commission is consistent with the expert's calculation.  Those are material and substantial differences.

Additionally, defendants do not dispute that ACE's Rule 30(b)(6) deponent testified that Ellicott was entitled to a 30% commission on the UNFI project.  Such testimony is likewise inconsistent with defendants' latest accounting.  Under Fed. R. Civ. P. 30(b)(6), a deponent designated thereunder must "testify about information known or reasonably available to the organization."   Ellicott's subpoena indicated that the Rule 30(b)(6) witness would be expected to testify concerning "[c]ommissions earned by [p]laintiff."  (Docket No. 134-5).  Under defendants' theory, ACE's February 2012 policy dictated the commission Ellicott earned on the UNFI project.  The policy would have been reasonably available to the deponent who testified in 2015.

Ellicott was justified in relying on that expert report and the Rule 30(b)(6) testimony and it would be unfair to introduce a new theory of recovery at this stage.  Accordingly, plaintiff's motion to exclude the August 2016 calculation will be granted.

**G.**   **Defendants' Motion on Finances and Pending Litigation (Docket No. 130)**

**1.**   **Finances**

Defendants seek to exclude evidence related to the sale of a 70% interest in ACE, and pending litigation where ACE sought compensation for withheld payments and renewable energy credits.  The pending sale and litigation appear to be irrelevant to this lawsuit and should be properly excluded.

**2.**   **Pending Litigation**

Defendants seek to exclude evidence of a lawsuit filed by former ACE salesperson, Michael Hagan, against ACE in Middlesex County Superior Court.  Ellicott contends that Hagan's employment dispute is relevant because Hunton testified that Ellicott's compensation agreement was based on Hagan's compensation agreement.  Ellicott further contends that statements of ACE witnesses in that case may be used as admissions or for impeachment with a prior inconsistent statement.

Under Fed. R. Evid. 403, the Court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Given the similarities between the two proceedings, it is possible that evidence concerning the Hagan lawsuit may be probative of some of the issues presented here.  However, that evidence, even if marginally relevant, should be excluded under Rule 403.  Such evidence may mislead the jury and waste time by putting the compensation of another employee at issue when only Ellicott's compensation matters for the resolution of this case.  Evidence of the Hagan litigation will therefore be excluded as a general matter.  That ruling does not, of course, preclude statements

for the purpose of impeachment or other evidentiary use of statements that may have been made in the course of the Hagan litigation.

**III.** <u>**Conclusion**</u>

For the foregoing reasons, and subject to the limitations set forth in this memorandum and order,

- plaintiff's motion to exclude evidence or argument that plaintiff was purportedly required to split commissions (Docket No. 122) is GRANTED in part and DENIED in part;

- plaintiff's motion to strike affidavit of Thomas Hunton (Docket No. 129) is DENIED;

- plaintiff's motion to exclude evidence or argument regarding plaintiff's withdrawn expense reimbursement claim (Docket No. 123) is GRANTED;

- plaintiff's motion to exclude evidence or argument that plaintiff is responsible for paying back "negative commissions" (Docket No. 124) is GRANTED;

- plaintiff's motion to exclude evidence or argument that business expenses previously paid to plaintiff are invalid (Docket No. 125) is DENIED;

- plaintiff's motion to exclude evidence or argument concerning defendant's purported commission calculation (Docket No. 134) is GRANTED; and

- defendants' motion on finances and pending litigation (Docket No. 130) is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated:  December 23, 2016                United States District Judge